IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DARLENE DAUGHTRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 08-963-SLR |
| | ) | |
| FAMILY DOLLAR STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

John M. LaRosa, Esquire, of the Law Office of John M. LaRosa, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John Wendell Beavers of John Wendell Beavers Associates, P.C.

David G. Culley, Esquire of Tybout, Redfearn & Pell, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Barbara Rittinger Rigo, Esquire, Shanthi V. Gaur, and Jacqueline R. Barrett, Esquire of Littler Mendelson, P.C.

**MEMORANDUM OPINION**

Dated: October 18, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Darlene Daughtry ("plaintiff") filed this action against defendant Family Dollar Stores, Inc. ("defendant"), her former employer, on December 23, 2008. (D.I. 1) Plaintiff alleges employment discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII") and 42 U.S.C. § 1981. After defendant filed a motion to dismiss or to sever on February 27, 2009 (D.I. 9), plaintiff filed her amended complaint on March 13, 2009. (D.I. 11) Both plaintiff's original and amended complaints named herself and seven other individuals as plaintiffs. (Id.) On March 27, 2009, defendant filed a second motion to dismiss or, in the alternative, to sever. (D.I. 12) As a result of the court's rulings on these motions, plaintiff's current remaining claims are: (1) hostile work environment in violation of § 1981 (count II) and retaliation in violation of Title VII and § 1981 (count V).[1] (D.I. 16) Presently before the court is defendant's motion for summary judgment on these claims. (D.I. 113) The court has jurisdiction pursuant to 42 U.S.C. § 2000e and 28 U.S.C. § 1331. For the reasons discussed below, the court grants defendant's motion for summary judgment.

## II. BACKGROUND[2]

### A. The Hiring, Promotion and Eventual Demotion of Plaintiff

---

[1] Plaintiff's claims are the only remaining claims in dispute. (D.I. 117 at 1)

[2] Initially, the court notes that plaintiff failed to provide a brief with a clear timeline of events or an easily digestible explanation of her arguments. In light of this, the court was left trying to fashion a balanced, accurate and organized narrative that related to defendant's arguments and plaintiff's claims. Reference to the plaintiff's amended complaint was not particularly helpful.

Plaintiff is a Delaware resident of African-American descent. She was hired by defendant in September of 2002 as a store manager. Over the next fifteen months, she managed a series of defendant's stores. In December of 2003, Regional Vice President Lee Downing ("Downing") promoted plaintiff from store manager to the position of "holding district manager." There is some dispute as to what exactly the position of "holding district manager" is and whether it is a position that generally proceeds a promotion to district manager. (D.I. 115 at 005-006) In April 2004, Downing promoted plaintiff to the position of district manager. Plaintiff began directly reporting to George Flyzik ("Flyzik"), the new Regional Vice President, in June of 2004.

A Human Resources representative and Flyzik both acknowledged that when defendant promoted plaintiff to district manager, it did not follow its typical training procedure, which entails sending future district managers to North Carolina for a week-long training session. (D.I. 118 at 039; 048-049) There is a dispute between the parties as to how defendant attempted to remedy its deviation from company policy. Flyzik testified that he relocated a training manger for a six-week, one-on-one training period (D.I. 115 at 062) and met with plaintiff more than with the other district managers that he supervised (*id.* at 045-046). Plaintiff denies ever having received one-on-one training. (D.I. 118 at 005) Plaintiff claims she did not become aware of what she now calls a discriminatory lack of training until after her demotion. (D.I. 133, Attachment 1 at 8)

Three allegedly race-related events occurred around the time of plaintiff's promotion. First, plaintiff testified that Downing, the individual who promoted her to

2

district manager, said it "looks good on the books" to have a "black female district manager." (D.I. 118 at 009-011) While the exact timing of this comment is unclear, it apparently occurred in 2004, around the time of her promotion. (*Id.*) Second, plaintiff testified that in October of 2004, shortly after being promoted to a district manager, Flyzik referred to another African-American employee as an "ugly looking black monkey." (D.I. 115 at 30) He purportedly did this in front of plaintiff and several other employees. (*Id.*) Third, in or around November 2004, plaintiff spoke with a Delaware Department of Labor investigator in support of Gina Jimenez ("Jimenez"), a former Hispanic employee who had filed discrimination charges against defendant. Plaintiff believed Jimenez to have a valid discrimination claim based upon comments plaintiff overheard. (D.I. 118 at 032) These comments were made by Downing and Billy Williams.[3] According to plaintiff's deposition transcript:

> A: [T]hey were joking. Billy says I went over to the store [that Jimenez managed] and they had all these Mother-F-ing Puerto Ricans in the store. And Lee Downing said, yea, it's like – – you know Puerto Ricans are like sardines in a can and can be packed together. . . . And there were other comments in regards to all Puerto Ricans known to be thieves.
>
> Q: Do you know whether [Jimenez] was accused of stealing?
>
> A: Billy Williams said he thought she was a thief. He had no proof. He – – that was just him. He thought she was a thief, but he thought all Puerto Ricans were thieves.

(*Id.* at 032) Moreover, when discussing Jimenez's claim with Flyzik, he told her that she did not need to talk to investigators and it might backfire if she did. Specifically, plaintiff

---

[3] Despite a through review of the record, the court was unable to determine who Billy Williams is or what his position was with respect to plaintiff.

3

testified that "[Flyzik said] well, you don't have to say anything [to the investigators], just direct them to our legal department. I said, well, I'm going to tell the truth. And he said, well, you don't want to get involved in that. Because if you get involved in that, it could backfire on you. But I did and I told the truth. I'm not going to lie." (Id. at 007)

According to defendant, plaintiff was unable to competently perform her role as district manager and, therefore, on June 1, 2006, approximately two years after being promoted to district manager, Flyzik demoted plaintiff to a store manager. Flyzik testified that he made the decision to demote plaintiff because of excessive shrink[4] problems and high employee turn-over rates.[5] (D.I. 115 at 049-051) Flyzik further testified that he told plaintiff "I don't really want to terminate you, so I think we're going to have a discussion about you stepping down to a store." (Id. at 049) Upon her demotion, plaintiff became store manager of store 810, and came under the direct supervision of Gus Stifano ("Stifano").

---

[4] Shrink is common phrase used in the retail sales industry. It is missing merchandise and can include anything "which cannot be accounted for by sales, transfers, returns, [or] price changes[.]" (D.I. 115 at 062)

[5] Flyzik testified that:

Darlene spent an awful lot of time . . . getting rid of thieves at her store. She did a terrific job. But that was the problem. We were hiring people on the payroll and getting rid of them, and it seemed that her and her managers were just doing a horrible job because of the turnover, and we couldn't build an organization in the store to protect the assets or to run the store to Family Dollar's standards. That's, basically, why I made the decision.

(D.I. 115 at 051)

4

Shortly before being demoted, plaintiff was involved in other allegedly race-related events. First, plaintiff made a complaint against Allen Fields ("Fields") after attending a manager's meeting on January 17, 2006. (D.I. 115 at 068; D.I. 118 at 043) At the meeting, Fields, one of plaintiff's superiors, addressed concerns about fines which defendant owed to the Department of Labor. (D.I. 115 at 068) After the meeting, plaintiff sent an email to Fields complaining that he had singled her out and incorrectly attributed the fines wholly to her district. (*Id.*) In the email, plaintiff credited Field's negative attitude towards her as him "hav[ing] something against" her. (*Id.*) Further, plaintiff stated in the email that she felt as though Fields treated her as if she were "stupid" and made her feel this way "every time" the two had a meeting together and she asked him a question. (*Id.*) Plaintiff testified that she believed Fields discriminated against her because she was African-American, and she stated that she felt this way because "[h]e constantly talked down to [her] and belittled [her] in front of other people." (*Id.* at 032-033) However, plaintiff admits that Fields never made any racist comments. (*Id.* at 034-035). Human Resources Director MicheleAnn Ireson ("Ireson") "personally" looked into plaintiff's discrimination allegations against Fields, but she found no basis to continue an investigation. (D.I. 118 at 043) Ireson testified that she found plaintiff's allegations to be without merit because Ireson had attended the January 17, 2006 meting and felt as though there was "no reason to suspect whatsoever that any discrimination took place." (*Id.* at 043)

5

Second, in early 2006, plaintiff became involved with Tara Valdez's ("Valdez") employment discrimination claim.[6] As far as the court can tell, Ms. Valdez believed she was being discriminated against and plaintiff spoke out in support of her to Flyzik and to the Department of Labor and Equal Employment Opportunity Commission ("EEOC"). (D.I. 118 at 012-013; D.I. 115 at 020) Moreover, after speaking with investigators from the Department of Labor and the EEOC, plaintiff testified that defendant's legal department called her and told her not to have any further interaction with investigators. (D.I. 115 at 021)

### B. Store 810 and Plaintiff's Eventual Termination

According to defendant, in early 2007 (January-February), store 810 was in "horrible" shape and plaintiff's ability to manage the store had come into question. (D.I. 115 at 145-146) There were concerns about employee theft (*id.* at 145-146), late openings (*id.* at 069), failure to submit new hire paperwork (*id.* at 069), plaintiff's repeated absences from the store (*id.* at 069; 145-146), and plaintiff's refusal to speak with superiors concerning store problems (*id.* at 069).

On February 28, 2007, plaintiff sent an email to defendant's CEO, Howard Levine ("Levine"), among others, which vaguely described incidents of discrimination and harassment she claimed to have endured during the course of her employment.[7]

---

[6] The court cannot decipher a more specific time frame in which this occurred. The record appears to reflect her involvement beginning in early 2006 (D.I. 118 at 012), but the parties' briefs discuss her talking to investigators later that year. (D.I. 114 at 8)

[7] While plaintiff does specifically refer to racial comments made by Downing, these appear to be the comments previously addressed in this opinion in which

(*Id.* at 082-083). Over the next few weeks, it appears that plaintiff's complaints were taken seriously enough by defendant to have been investigated by at least two separate individuals from Human Resources. (*Id.* at 082; 085-086; 099)

On April 11, 2007, plaintiff injured herself while on the job. She went out of work on medical leave sometime thereafter. While on medical leave, plaintiff was asked to return her keys to store 810. The parties dispute how this occurred and what it meant regarding plaintiff's employment. Plaintiff claims that, on or about April 20, 2007, Stifano called her and requested that she return her keys to store 810; plaintiff states that Stifano told her "not to return" and, when she asked him why she was being terminated, he responded, "you know the reason." (D.I. 118 at 019) In light of this exchange, plaintiff believes she was terminated on this date. (*Id.*) Defendant maintains that it did not terminate plaintiff at this time. Jeffrey Lunsford ("Lundsford"), an assistant district manager, testified that defendant requested plaintiff's keys because there are a limited number of keys to each store and, "when a manager is out on medical leave, or whatever reason they are out, we take the keys back from all managers because we need them to run the store properly." (D.I. 115 at 075) Defendant also notes that, between April and June of 2007, it: (1) attempted to place plaintiff on a Performance Improvement Plan ("PIP") (*Id.* at 105); (2) sent her Family and Medical Leave (FLMA) paperwork to fill out (D.I. 120 at 14-21); and (3) retained her on the payroll (as

---

Downing says that it looks good to have an African-American female district manager on the books.

evidenced by pay stubs showing that plaintiff was on unpaid leave) (D.I. 120 at 22) - things that would not have been done had plaintiff been previously terminated.

Sometime in May 2007, while plaintiff was on leave, Stifano claims that he was alerted by an employee that plaintiff was operating a competing store, called "K and D's," in violation of defendant's Code of Business Conduct ("the Code"). (D.I. 115 136-137) According to the Code, employees "must avoid any actual or apparent conflict of interest." (*Id.* at 106-108) "A conflict of interest occurs in situations where [an employee's] personal interest and the best interests of the [c]ompany are in actual or potential conflict." (*Id.*) Examples of conflicts are provided and include, "[h]aving an interest in any business that competes with the company" and "[p]roviding services to or representing a competing business." No employee is permitted "to enter into any situation, including [those examples] described that may be considered a conflict." (*Id.*) The allegation of a conflict was investigated; defendant concluded that plaintiff was operating a store in violation of the Code because K and D's was selling the same types of merchandise sold by defendant. (*Id.* at 117; 136-137) There is no dispute that plaintiff owned and managed a K and D's store since 2006. (D.I. 120 at 9)

According to defendant, upon learning of K and D's, Ireson and Stifano decided to terminate plaintiff because the operation of plaintiff's store was a violation of the Code. (D.I. 114 at 15) However, before a disciplinary meeting could be scheduled, plaintiff's attorney contacted defendant's attorney claiming that defendant had already terminated plaintiff. (*Id.*; D.I. 115 at 124) According to defendant, defendant's counsel requested plaintiff to attend a meeting on June 6, 2007. (D.I. 115 at 124) Defendant maintains

that plaintiff refused to attend the June 6th meeting, which led defendant to officially terminate plaintiff on June 4, 2007. (*Id.* at 124-125) On June 4, 2007, defendant sent plaintiff a letter terminating her employment and citing as impetus for her termination her refusal to attend a meeting on June 6th, as well as "other policy violations which we hoped to address with Ms. Daughtry at the June 6th meeting." (*Id.* at 125)

On May 23, 2007, plaintiff filed charges with the EEOC. (*Id.* at 126) The EEOC issued plaintiff a right to sue letter on October 2, 2008. (D.I. 11 at ¶ 11) On December 23, 2008, plaintiff filed the action at bar. (D.I. 1)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts

and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Section 1981 Hostile Work Environment Claim

#### 1. Standards

Section 1981 prohibits race-based discrimination in the making and enforcement of contracts. Section 1981, as amended by the Civil Rights Act of 1991, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §

10

1981(b). These rights are protected from encroachment by both private and state actors. *See* 42 U.S.C. § 1981(c). While § 1981 and Title VII are separate and distinct statutes, § 1981 hostile work environment claims are analyzed under Title VII standards. *Barbosa v. Tribune Co.*, No. Civ.A. 01-CV-1262, 2003 WL 22238984 (E.D. Pa. Sept. 25, 2003) (citations omitted); *Griffin v. Harrisburg Property Services, Inc.*, No. 1:CV-08-1655, 2009 WL 4061229, at *4 (M.D. Pa. Nov. 23, 2009) ("The elements of a hostile work environment [claim] are the same under § 1981 as they are under Title VII.") (citation omitted).

The parties agree that a five part test exists with respect to hostile work environment claims. Plaintiff must prove that: (1) she suffered intentional discrimination based on her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that same position; and (5) the existence of respondeat superior liability. *See McLean v. Commc'n Constr. Group, LLC*, 535 F. Supp. 2d 485, 490 (D. Del. 2008) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3rd Cir. 1990)).

Defendant's summary judgment motion essentially argues that plaintiff cannot meet her burden with respect to element two. (D.I. 114 at ¶ IV.B.3) In support of this argument, defendant directs the court to cases such as *Meritor Savings Bank, FSP v. Vinson*, 477 U.S. 57 (1986), for the proposition that the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to sufficiently

11

significant degree to violate Title VII," *id.* at 67 (citation and quotation omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), for the proposition that, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" actionable hostile work environment claims, *id.* at 788 (citation and quotation omitted); and *Barbosa*, 2003 WL 22238984, at *3, for the proposition that "[r]acial comments that are sporadic or part of casual conversation do not violate Title VII." *id.* at *3. (D.I. 114 at ¶ IV.B.3) Essentially defendant's motion emphasizes that, in order to "satisfy the second prong of the hostile work environment claim, 'the harassment must be so serve or pervasive that it alters the conditions of the victim's employment and creates an abusive environment.'" *Carattini v. Wood Services, Inc.*, Civ. No. 08-5201, 2010 WL 447453, at *3 (E.D. Pa. Feb. 4, 2010) (citing *Weston v. Pennsylvania*, 251 F.3d 420 (3rd Cir. 2001)). Defendant contends that there was only one "isolated" racist comment - the comment by George Flyzick - and that is insufficient to establish a viable hostile work environment claim. (D.I. 114 at ¶IV.B.3)

The court does not disagree with defendant as to the burden placed on plaintiff. The standards "for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (citation and quotation omitted). In analyzing the second element of a hostile work environment claim, it is incumbent upon the court to look at the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive

utterance, and whether it interferes with an employee's work performance." *Eric v. Donsco Inc.*, Civ. No. 1:09-CV-1052, 2010 WL 5018574, at * 6 (M.D. Pa. Oct. 12, 2010) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

### 2. Instances of race discrimination

Plaintiff does not specifically direct the court to the instances of race discrimination upon which she bases her claim. Instead, plaintiff has provided the court with a disjointed factual narrative and then summarily concludes that all five elements of the hostile work environment claim were satisfied. (.D.I. 117 at ¶ IV.B) In light of this, the court was required to prepare, as best it could, a cohesive and balanced narrative of relevant factual events. Having done this, the court concludes that plaintiff bases her § 1981 hostile work environment claim on two instances of race discrimination: (1) the comments allegedly made by Lee Downing with respect to it looking good for defendant to have a black female district manager on its books; and (2) the comment allegedly made by George Flyzik regarding an African-American employee looking like a monkey.

The court does not find that any other alleged conduct qualifies as race-related discrimination. To be considered race-related discrimination, plaintiff "must demonstrate that race played a substantial role in the harassment and she would have been treated more favorably had she been Caucasian." *Cannon v. Correctional Med. Servs.*, 726 F. Supp. 2d 380, 393 (D. Del. 2010) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3rd Cir. 1990)). First, to the extent that plaintiff argues she was harassed for supporting Jimenez and Valdez

13

in their claims of discrimination, the court finds that this alleged harassment was not race-related. A review of the record reveals that her superiors' reactions were not based upon her being an African-American woman, but instead were based upon her cooperation with investigators. Second, to the extent that plaintiff bases her claim on her interactions with Fields, the court notes that there is no directly racial component to their interactions; instead, it appears that plaintiff subjectively felt that Fields had a problem with her because of her race. Without more, the court cannot say that Field's interactions with plaintiff constituted race-based discrimination. Third, to the extent that plaintiff relies on her February 28, 2007 email to establish her claim, the court notes that the email makes only generalized allegations regarding harassment and discrimination. Without specific explanations as to how the discrimination occurred, the court cannot say whether there was discrimination or if it was related to plaintiff's race. Moreover, any argument that defendant discriminated against plaintiff by failing to investigate her complaints is contradicted by the record. Fourth, the court declines to consider plaintiff's lack of training (and alleged demotion resulting from this lack of training) as a means by which she can support her claim. Nowhere in plaintiff's complaint does she indicate that these allegations will be a basis for her hostile work environment claim. The complaint provides no factual basis for a hostile work environment claim;[8] instead, it loosely sets forth facts in

---

[8] Defendant did not file a motion to dismiss on this ground.

support of a retaliatory conduct claim in the factual allegations section and then inserts generic statements about the use of racial slurs and jokes in count II. While the court has reviewed plaintiff's hostile work environment claim based upon factual allegations not specifically pled in her complaint, the court will not go so far as to allow plaintiff to base her claim on events that are not connected to her generic allegations regarding the use of racial jokes and slurs. Lastly, for the same reason the court will not consider a claim based upon plaintiff's lack of training, the court also refuses to consider that alleged retaliation constitutes race discrimination.

In summary, the only race-related conduct on which plaintiff can base her claim is the comments allegedly made by Downing and Flyzik. For the reasons discussed more fully below, the court finds that both these instances of race discrimination fall outside the applicable statute of limitations. For that reason, the court need not decide whether these comments were sufficiently severe or pervasive.

### 3. Statute of limitations

Plaintiff's claims are subject to a four-year statute of limitations.[9] *See*

---

[9]Although § 1981 previously prohibited discrimination in the "making and enforcing" of contracts, it was expanded in 1990 to prohibit discrimination that occurred after the formation of the contract at issue. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372-73 (2004); *see also Chugh v. Western Inventory Services, Inc.*, 333 F. Supp. 2d 285, 294-95 (D.N.J. 2004) (stating that the 1990 amendments to § 1981 relate to injuries that occur after the formation of the employment agreement). Claims brought pursuant to the original version of § 1981 are subject to the applicable state statute of limitations for the underlying injury; however, claims brought pursuant to the

15

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 380-85 (2004); *see also Smith v. Amerada Hess Corp.*, Civ. No. 05-560, 2005 WL 2897459, at *3 (D.N.J. Oct. 31, 2005). Under a hostile work environment claim, assuming one discriminatory act contributing to the claim falls within the applicable statute of limitations, the entire time period of the hostile environment may be considered for purposes of determining liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). In other words, so long as one discriminatory act occurred within four years of filing, the court can consider discriminatory acts that fell outside of the four-year statute of limitations. This is because a hostile work environment claim is different than a discrimination claim based on discreet acts; by its very nature, a hostile work environment is created over time. *Id.*

In the present case, plaintiff filed her claim on December 23, 2008. Accordingly, plaintiff was required to set forth one race-based discriminatory action that occurred after December 23, 2004. She has failed to do so, and for that reason, her § 1981 claim is time-barred. As discussed above, the only race-based discrimination upon which plaintiff bases her claim relates to comments allegedly made by Downing and Flyzik. As far as the court can tell, the Downing comment was allegedly made around April of 2004 and the Flyzik comment was allegedly made in October of 2004. As neither occurred after December 23,

---

1990 amendments to § 1981 are subject to a four-year statute of limitations. *See Jones*, 541 U.S. at 380-85; *see also Smith v. Amerada Hess Corp.*, Civ. No. 05-560, 2005 WL 2897459, at *3 (D.N.J. Oct. 31, 2005).

2004, plaintiff's hostile work environment claims are time-barred.

## B. Retaliation Under § 1981 and Title VII

### 1. Standards

As the substantive elements of a claim under § 1981 are generally identical to the elements of a discrimination claim under Title VII, the court will analyze plaintiff's retaliation claims under Title VII standards. *Brown v. J. Kaz, Inc.*, 581 F.3d 175 (3rd Cir. 2009). Moreover, retaliation claims proceeding under a pretext theory follow the burden-shifting framework set forth in *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973). *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

In order to establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in protected activity; (2) she was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge. *Woodson*, 109 F.3d at 920; *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). Once plaintiff makes a prima facie case of retaliation, defendant has the burden of producing "some legitimate, nondiscriminatory reason" for terminating plaintiff. *Woodson*, 109 F.3d at 920. An employer satisfies its burden of production by "introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason **actually** motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3rd Cir. 1994).

Once defendant has produced a legitimate non-discriminatory reason for termination, the burden then shifts back to plaintiff to prove that the reason offered is simply a pretext for discrimination. At trial, a plaintiff would be required to prove that defendant's reason was false and the discrimination was a determinative factor in the termination. *Id.* However, to survive a summary judgment motion in which a legitimate non-discriminatory reason has been proffered, plaintiff need only "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." *Id.* at 764.

While there is "no hard and fast rule" regarding what constitutes protected activity, the Third Circuit has held that protected conduct includes "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3rd Cir. 2006).

### 2. Discussion

In the present case, defendant does not genuinely contest plaintiff's claim that she engaged in protected activity; instead, defendant argues that plaintiff cannot demonstrate any casual connection between her protected conduct and her termination. (D.I. 114 at ¶ IV.C.1) While defendant argues that plaintiff's support of

Jimenez and Valdez are the only protected conduct she engaged in, the court believes that plaintiff's February, 28, 2007 email to defendant's CEO could also constitute protected conduct.

Despite the fact that defendant only seriously contests causation, plaintiff's reply brief focuses on the existence of protected conduct and does not address the issue of casual connection. The court will not make plaintiff's case for her. Because plaintiff has failed to direct this court to any evidence that would suggest the existence of a casual connection, plaintiff has not met her burden with respect to a required element of her claim. Even if plaintiff had directed the court to such evidence, however, defendant has produced a legitimate non-discriminatory reason for plaintiff's termination: according to uncontradicted evidence, plaintiff was operating a store in violation of the Code and refused to meet with defendant to discuss the violation. While plaintiff argues that this is merely pretext since she was terminated prior to this discovery, the facts of record contradict plaintiff's assertion.

## V. CONCLUSION

For the reasons discussed above, the court grants defendant's motion for summary judgment and enters judgment in defendant's favor. An appropriate order shall issue.